# CHARLESTON.

SECURITIES & INVESTMENT CORPORATION v. J. W. HERON.

## Submitted April 19, 1921. Decided April 26, 1921.

1. BILLS AND NOTES—*No Recovery on Note Transferred in Violation of Conditions of Delivery Unless Transferee, a Bona Fide Holder.*

   One who executes and delivers to a corporation through its duly authorized agent a negotiable promissory note as the price of property which he contemplates purchasing from such corporation, upon the condition that such note shall not become a valid and binding obligation until he has had an opportunity of examining and inspecting the property at the expense of the owner thereof, and approving the same; or, in case he is not satisfied with said property, that said note will be returned to him, cannot be held liable in a suit upon said

note by a party to whom the same was transferred in fraud of his rights, and in violation of the conditions upon which the same was delivered, unless such transferee or endorsee shows that he is a bona fide holder of the same for value in due course.   (p. 561).

2.   Same—*Transferee of Note Transferred in Violation of Conditions of Delivery Held Not a "Bona Fide Holder."*

One to whom such note is transferred, in fraud of the rights of the maker, for the purpose of holding the same until due, and applying the proceeds thereof after the same is paid to the discharge of an obligation of such fraudulent transferor, is not a bona fide holder thereof for value in due course, and in a suit brought by a third party to whom such note was transferred by such first transferee after its maturity the maker is entitled to the benefit of all of the equities existing between him and the original holder thereof, and to make all of the defenses which he might make were the suit brought by such original holder.   (p. 561).

Error to Circuit Court, Cabell County .

Action by the Securities & Investment Corporation against J. W. Heron.   Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*Williams & Mullen,* and *Fitzpatrick, Campbell, Brown & Davis,* for plaintiff in error.

*Holt, Duncan & Holt* and *Warth, McCullough & Peyton,* for defendant in error.

Ritz, President:

Plaintiff brought this suit in the circuit court of Cabell county to recover the amount of a negotiable promissory note executed by the plaintiff, which resulted in a judgment in favor of the defendant, to review which this writ is prosecuted.

Sometime prior to July, 1916, Tangiers Manors Corporation became the owner of a tract of land on Long Island in the State of New York which it proceeded to lay off into lots, and put upon the market.   It appears that all of the purchase money was not paid for the property, and that a mort-

gage existed thereon in favor of the former owner. It further appears that in order. to improve the property, as is alleged the Tangiers Manors Corporation issued bonds in the amount of one million dollars, and secured the same by a mortgage upon said property. These bonds it is claimed were sold to various persons desiring to invest therein. The mortgage securing the bonds was executed to the Virginia Trust Company, and a man by the name of Mullen, as trustees, and these trustees were authorized to release such portions of the property as might be sold from the lien of the deed of trust, upon the payment of certain sums of money which were fixed for the respective lots of land, or the delivery of an equal amount of the bonds.   It further appears that the holders of these bonds organized the plaintiff corporation for the purpose of holding the bonds and collecting the same.   One A. L. Hawes was and is secretary and treasurer of the plaintiff corporation, and its active managing officer. The purpose of the Tangiers Manors Corporation was to sell the property owned by it, and as the same was sold and the money received therefor, turn over such amounts of purchase money as was required to have the portions which had been disposed of released from the mortgage.   It appears that a man by the name of Quinby was the owner of a majority of the stock of the Tangiers Manors Corporation, was its active managing officer, and was authorized to conduct its operations in making sales of its property.  Associated with him in this work were R. B. Parrish, C. F. Diffenderfer, and a man by the name of Gerwood. The method pursued by Quinby, Parrish, Diffenderfer and Gerwood was to interest a number of responsible people in a community in the real estate, and have them join in a purchase of a considerable number of lots, instead of selling separate lots to each individual. . They negotiated with a number of such people living in the vicinity of Huntington, West Virginia, with a view to selling to them a part of the real estate listed at two hundred and fifty thousand dollars, the purchase price to be one hundred and twenty-five thousand dollars, or one-half of the list price.   These parties were to pay $62,500.00 in cash, and the remaining $62,500.00 was to

be secured by a deed of trust upon the property purchased. In order to release the property so proposed to be sold to the Huntington parties, it was necessary to pay to the trustees in the million dollar mortgage $26,500.00 in cash, or to turn over to them that amount of the bonds secured by the mortgage.  The defendant is one of the parties who was induced to enter into this arrangement.  It appears from the evidence that before commencing negotiations with the defendant they had secured eleven other persons who had agreed to take an interest in the lots at the price aforesaid, and it only remained to dispose of an additional five thousand dollar interest to complete the syndicate.  In other words, at the time Heron was approached the other parties had already agreed to put up $57,500.00 for the purpose of effecting the purchase, and upon Heron's entering into the arrangement to the extent of five thousand dollars the pool or syndicate was complete.  These sales agents had no acquaintance with the defendant, but one of them, Parrish, had a long association and acquaintance with M. J. Ferguson, who was the cashier of the bank of which Heron was president, and Parrish, through Ferguson, arranged for an interview with the defendant.  This conference was had in the director's room of the bank of which the defendant was president on the evening of the 17th of July, 1916.  Ferguson had already agreed to become a member of the syndicate to the extent of five thousand dollars.  The plans were outlined to Heron upon this occasion and the prospects of making substantial profits out of the property were fully detailed to him.  He agreed to become a member of the syndicate and to take an interest therein to the extent of five thousand dollars, provided he found upon investigation that the representations made in regard to the property were true.  Parrish and his associates agreed with him that at the expense of the Tangiers Manors Corporation they would take him to Long Island and show him the property, and go over all of the company's affairs with him in order that he might be convinced of the truth of their statements, and he agreed that if upon such examination he found their representations to be

correct he would take the interest aforesaid. He was then requested to excute a note for five thousand dollars representing the cash payment agreed to be paid by him as his part of the purchase. This, he at first declined to do, but upon the representations of Parrish and his associates that all of the other parties had executed notes on the like understanding, and that it only awaited his action to close up the transaction; and that his note would be held and no use made of it until he had examined the property and satisfied himself as to the same; or, in case of his dissatisfaction, that the note would be at once returned to him; and upon the statement of Ferguson that he had known Parrish for many years, and had been associated with him in business during that time, and that he was an honest man, and could be relied upon to do just what he said, Heron did execute the note sued on in this case for five thousand dollars, and delivered the same to Parrish to be held by him with the understanding above indicated; that at the same time he made an engagement to go to New York with Gerwood on the following Friday to make an examination and investigation; that on the day before he and Gerwood were to leave for the purpose of making the examination of the property Gerwood came to him and told him that it was impossible for him to go at the time agreed upon, and at the instance of said Gerwood the trip was postponed for one week; that on the day before they were to leave, in accordance with the second appointment, Gerwood again came to him and told him that it was impossible for him to leave at the time appointed, and asked to have the trip postponed to a later date which he would fix in the very near future; that Heron agreed to this with the understanding that the day fixed would not be on the last of the month or the first day or two in the succeeding month; that he never saw Gerwood, or any of the parties interested in promoting the sale, after this time, and that he never heard anything further from the note which he had delivered to Parrish until about a year thereafter when he was called upon to pay interest thereon; that he declined to pay any interest upon the note and denied that he was liable to pay anything thereon

because of the fact that the conditions upon which the note had been delivered had never been complied with.

It appears that when Quinby, Parrish, Diffenderfer and Gerwood secured the notes from the Huntington people, including the defendant, they, or some of them, took them to Richmond and endeavored to have the trustee in the million dollar mortgage release the land proposed to be sold to the Huntington people upon delivery to the said trustee of sufficient of these notes to cover the release price in lieu of cash or the bonds secured by the million dollar mortgage. The Virginia Trust Company, one of the trustees, refused to execute this release upon the delivery of the notes, but required that before doing so it receive bonds of the Tangiers Manors Corporation or cash. The Tangiers Manors Corporation then, through Parrish and his associates, entered into negotiations with the plaintiff, through its secretary and treasurer, who was also secretary and treasurer of the Tangiers Manors Corporation, to secure sufficient of the bonds to deposit with the Virginia Trust Company to secure the release desired. Hawes says that he was anxious to assist the Tangiers Manors Corporation in making sales of its property, and after making some inquiry as to the solvency of the makers of these notes, he agreed that he would turn over sufficient of the bonds held by the plaintiff in this suit to secure the release desired, and would at the same time endorse these notes, including the note of the defendant, in the name of the plaintiff, and let the same be delivered to the trustee along with the bonds, with the understanding that if the notes were paid at maturity the money thus collected would be substituted for the bonds, and the bonds returned to the plaintiff. The Virginia Trust Company agreed to make the release upon these conditions. Hawes then endorsed the notes with the name of the plaintiff, and the same, together with $27,000.00 of the mortgage bonds, were delivered to the Virginia Trust Company, and a release of the mortgage executed' so far as it was a lien upon the lands proposed to be sold to the Huntington people, the understanding being as shown by the testimony of the trust company's officer, that in case these notes were paid at maturity the trust company would substitute the money thus col-

·lected for the bonds and return the bonds to the plaintiff. The notes were not paid at maturity, and the trust company, in making a settlement of its accounts in a suit brought to foreclose the mortgage, used the bonds turned over to it for that purpose and delivered the notes, including the note sued on in this case, to the plaintiff in this suit, and upon the failure and refusal of the defendant to pay this note this suit was instituted to collect the same, with the result above indicated.

There is no dispute as to any of the material facts. That the defendant executed and delivered the note to Parrish with the understanding that it should not be used until he had examined the property and was satisfied therewith; or, in case of his dissatisfaction, that the same should be returned to him, is conceded; that the note was used in violation of this agreement is likewise conceded; that the Tangiers Manors Corporation, through its agents, agreed to conduct the defendant to the property for an examination thereof, and for an examination of its affairs at its expense, is likewise admitted; and that it, through its agent, postponed this examination from time to time, and finally disappeared from the scene of the operations without complying with its undertakings, is proven, and not denied, and from this fact it may fairly be inferred that it never was intended from the beginning that the defendant should have any opportunity of making an examination of the company's property and affairs, and that these delays and postponements from time to time were for the purpose of enabling the Tangiers Manors Corporation to dispose of the notes and get them in the hands of·a party who had not participated in the fraud. It may, therefore, fairly be assumed that the Tangiers Manors Corporation, through its agents Parrish, Quinby, Diffenderfer and Gerwood, perpetrated a fraud upon the defendant in the use made of this note in violation of the agreement upon which it was delivered. It is shown that Parrish and Diffenderfer were both within the jurisdiction of the court, and could have been brought to testify as witnesses in the case if the statements made by Heron and Ferguson in this regard were not correct, but the

plaintiff made no attempt to procure their attendance or offer their evidence.

The sole contention of the plaintiff is that while the Tangiers Manors Corporation did perpetrate a fraud upon the defendant, it cannot be charged therewith, and that it is entitled to recover upon the note sued upon, upon the theory that it is a bona fide holder thereof for value in due course, and is not affected by any fraud or any equities which existed between the defendant and the Tangiers Manors Corporation. It also asserts that this note was not given by Heron to the Tangiers Manors Corporation, but was given to the Surry Realty Company, a West Virginia corporation, in payment for stock subscribed for by Heron in that company, and was by the Surry Realty Company turned over to the Tangiers Manors Corporation as part payment for the land purchased by the Huntington syndicate. This Surry Realty Company was chartered by the State of West Virginia several weeks after this note was given and delivered to Parrish, and it was a corporation organized by the Huntington syndicate simply for the purpose of holding the title to this real estate when the purchase was consummated. No stock therein was ever issued to Heron, and no meeting aside from the organization meeting was ever held, and Heron was not present at that meeting. The contention that the Surry Realty Company had any dealings with the Tangiers Manors Corporation by which this note was passed to the latter company cannot be sustained, for the very sufficient reason that the Tangiers Manors Corporation had secured this note long before the Surry Realty Company ever had any existence. It is quite clear that the Surry Realty Company was organized for the purpose, and for the purpose only, of meeting the convenience of the Huntington purchasers in handling the property, and it had no connection with the sale made by the Tangiers Manors Corporation. It is true the deed, when it was made by the Tangiers Manors Corporation, was made to the Surry Realty Company, but this was long after the transaction had been completed. There is nothing in the contention, therefore that this note was given to the Surry Realty Company in payment for stock subscribed for by Heron and issued by

that company, and turned over to the Tangiers Manors Corporation as a part payment for the real estate. It is true Hawes swears that this was the case, but he knew nothing about it. In fact, it is doubtful whether he knew that there was such a corporation as the Surry Realty Company at the time he first became connected with this note, and it may well be doubted whether the Surry Realty Company in fact had applied for its charter at that time.

The principal contention of the plaintiff is, however, that while the Tangiers Manors Corporation may not have been a bona fide holder of the note while the same was in its possession, the Virginia Trust Company, the trustee in the deed of trust, did become such bona fide holder when the same was turned over to it under the circumstances above indicated, and that inasmuch as the plaintiff received this note from the Virginia Trust Company, an alleged bona fide holder thereof in due course, it holds the same without being charged with any equities or fraud between the maker and the original holder, the Tangiers Manors Corporation, notwithstanding said note was delivered to it long after it was due. As to whether the plaintiff taking this note after its maturity from the Virginia Trust Company would be affected by the fraud on the part of the Tangiers Manors Corporation in the transaction, were the Virginia Trust Company a bona fide holder for value in due course, we need not determine upon the view we have of this case. This contention is based entirely upon the assumption that the Virginia Trust Company was such bona fide holder for value in due course. Of course if it was not such holder, then the transfer by it to the plaintiff, after its maturiy, would charge the plaintiff with all equities between the maker and the party to whom it was originally delivered. In order that the holder of a negotiable promissory note shall be a bona fide holder for value in due course, he must have paid value therefor, and the same must be delivered to him without condition, that is, it must become his property after having paid money or something of value therefor, without knowledge of any defects in the transferor's title. If such holder has knowledge that the title of his transferor is bad, or that the note is tainted with fraud, he will

not be held to be a bona fide holder for value; or if the note is delivered to him without valuable consideration he cannot be treated as a bona fide holder thereof; or if the note is delivered to him for the purpose of collecting it and making a particular application of the proceeds when so collected, he will be held to be nothing more than the agent of the transferor. "Joyce's Defenses to Commercial Paper" § 314 and § 457; *Brooks* v. *Whitson* (Miss.) 15 Sm. & M. 513; *Solomons* v. *The Bank of England,* 13 East 135; *Logan* v. *Cassell,* 88 Pa. St. 288, 32 Am. Rep. 453. Now the uncontradicted evidence in this case shows that the Virginia Trust Company never was the real owner of this note. Plaintiff does not claim that it ever acquired any interest in the note until the spring of the year 1918, long after it was due. This is testified to unequivocally by its secretary and treasurer. It is shown without dispute that the Virginia Trust Company refused to take the notes offered to it, including the note sued on in this case, and execute the release, but required as a consideration for executing the release the delivery to it of the amount of money called for by the terms of the mortgage, or a like amount of the bonds secured thereby. In fact, this is all it could do under the terms of the mortgage. It had no authority to execute the release upon any other conditions, and it required a fulfillment of these conditions before it executed and delivered the same. That these bonds were furnished by the plaintiff in this case there seems to be no question, and that the terms upon which it loaned these bonds to the Tangiers Manors Corporation, in order that it might secure the release, were that the notes taken by the Tangiers Manors Corporation, should be deposited with the Virginia Trust Company and held by it until maturity, and if paid, the money thus secured substituted for the bonds, and the bonds returned to the plaintiff. This requirement was no doubt imposed to prevent the Tangiers Manors Corporation from transfering these notes to some one else. The officers of the plaintiff apparently knew of the tendency of the Tangiers Manors Corporation and its officers to indulge in fraudulent practices in conducting the business of that corporation, and to secure to itself at least

these notes it required that the same be deposited with the Virginia Trust Company under the arrangement aforesaid. Of course, if there had been no infirmity in the notes, and the same had been paid at maturity, the money thus derived would have been substituted by the Virginia Trust Company for the plaintiff's bonds, and the bonds returned to it. The Virginia Trust Company in this transaction was holding these notes simply with a view to their collection for the benefit of the Tangiers Manors Corporation. That company was in no sense a bona fide holder for value in due course under the authorities above cited. It had given nothing for the notes, and its only undertaking was to apply the proceeds thereof in a particular way when the same were paid. This being true the plaintiff in this suit, taking this note as it did after the same had matured, holds the same subject to all the equities existing between the maker and the Tangiers Manors Corporation, and subject to all the defenses which might be made by the defendant to a suit brought by the Tangiers Manors Corporation thereon, and it cannot be doubted that that company not only acquired this note fraudulently, but fraudulently used the same and failed to return it upon noncompliance with the condition upon which it was delivered by the defendant.

There is some complaint made in this case about the refusal of instructions requested by the plaintiff, and the giving of an instruction on behalf of the defendant. It becomes unnecessary for us to inquire whether the action of the court in giving the instruction complained of, and in refusing to give those offered by the plaintiff, was correct or not. There was no question of fact to be submitted to the jury. The parties were substantially in agreement as to all of the pertinent facts, and the case on these undisputed facts was either for the plaintiff, or for the defendant, and it was the duty of the court to say which party was entitld to a verdict upon the undisputed facts. It was requested to instruct the jury to find a verdict for the defendant. This instruction should have been given. Inasmuch, however, as the jury has found the only verdict which the undisputed facts warranted, no just complaint can be made to the action of the court in refusing to

give instructions which may or may not propound correct propositions of law.

We find no error in the judgment of the circuit court complained of, and the same is affirmed.

*Affirmed.*